# Exhibit 6

JUDICIAL NOTICE

# Judicial Notice (08.12.23): Sun's Out, Guns Out

A slew of sexy Second Amendment rulings, a bizarre lawsuit from a Kirkland alum, Viet Dinh leaving Fox, and other legal news from the week that was.



**DAVID LAT**
AUG 13, 2023 • PAID

 20    9      Share   



Judge Tanya S. Chutkan (courtesy photo via the Administrative Office of the U.S. Courts).

Hello from our place in the Berkshires, where Zach and I are spending some time during these lazy days of August. We're here with Zach's parents, who are helping us out with newborn Chase, while my parents are taking Harlan on a Disney cruise. Grandparents are the best (seriously).

Now, on to the news, much of which emerged in so-called Friday news dumps—which is why I usually write and publish Judicial Notice over the weekend, even if it often kills my Saturdays.

**Lawyer of the Week: David Weiss.**

One piece of news announced on Friday afternoon was Attorney General **Merrick Garland**'s appointment of **David C. Weiss**, the Trump-appointed U.S. Attorney for Delaware who has been investigating possible criminal conduct by first son **Hunter Biden**, as special counsel. Making Weiss a special counsel makes sense as a matter of optics: it stresses to the public the independent nature of the investigation, while responding to Republican criticism that the Biden DOJ has been going easy on Hunter.

But as a practical matter, it might not change much. As noted by Charlie Savage for the New York Times, "both Mr. Garland and Mr. Weiss have already said the prosecutor was empowered to act independently." Perhaps the most important difference is that as special counsel, Weiss must issue a report to Attorney General Garland, who has said he intends to make as much of that report public as possible.

Many Republican politicians attacked the appointment. Representative Jason Smith (R-Mo.), chairman of House Ways and Means, said that "this appointment is meant to distract from, and slow down, our [congressional] investigations" into Hunter. Furthermore, as noted by the Wall Street Journal editorial board, "Special-counsel status is politically convenient for Messrs. Weiss and Garland because it means both men can use the excuse of an 'ongoing investigation' to refuse to answer questions from Congress" (which Weiss had previously said he was willing to do).

But I'm not quite as pessimistic. Please allow me to speculate, for now about the David Weiss situation (and later on in this post, about **Viet Dinh**'s departure from Fox).

Delaware is a small state with a small legal community. People there are… *nice*. I don't know whether Weiss personally knows or has ties to the Bidens, but he surely has many friends and colleagues in common with them. Becoming Hunter Biden's Inspector Javert could make Weiss's return to private life in his home state… awkward. With all due respect to Governor John Carney, the Bidens are the true First Family of the First State. If you had to pick a single U.S. Attorney from the Trump Administration to hold over to handle the Hunter Biden case, the U.S. Attorney for Delaware was probably your worst pick (or your best, depending on your goals).

So Weiss was probably hoping—and expecting—to put the Hunter Biden case to bed as quickly and quietly as possible. But then... s**t happened. IRS whistleblowers went to Congress, congressional Republicans screamed bloody murder, and perhaps most importantly, Judge **Maryellen Noreika** (D. Del.) refused to serve as a "rubber stamp" for Hunter's plea agreement. Instead of quickly approving it, as many other judges might have done, she subjected it to appropriate judicial scrutiny—causing it to disintegrate, in a matter of minutes.

As Justice Brandeis famously quipped, sunlight is the best disinfectant—and a ton of it has been directed at the Hunter Biden case lately. Weiss presumably now realizes he must treat Hunter just like any other defendant—which might explain why on Friday, he made court filings in Hunter's Delaware case indicating that (1) the plea negotiations are basically dead; (2) the government wants the Delaware tax charges dismissed, possibly because Weiss will bring more serious charges against Hunter in other districts; and (3) "[t]he government now believes that the case will not resolve short of a trial." This all amounts to quite an about-face.

Perhaps Weiss is now prepared to zealously but fairly investigate and prosecute Hunter Biden, at least on charges where the statutes of limitations haven't run (and critics of Garland and Weiss might note that all this delay could have been designed to do just that). Perhaps Special Counsel David Weiss can or will do things that Delaware U.S. Attorney David Weiss couldn't or wouldn't. Perhaps the change in title to "special counsel" is important not just to the American people, in terms of how we view the investigation, but to David Weiss, in terms of how he sees himself.

[**UPDATE (8/20/2023, 10:33 p.m.)**: This interesting Washington Post piece supports my theory of what happened here, noting that (1) Delaware is basically "a small town and everybody knows each other," and (2) Weiss worked with Hunter's late brother, Beau Biden, before the investigation into Hunter began.]

**Judge of the Week: Judge Tanya Chutkan.**

This week, Judge **Tanya S. Chutkan** (D.D.C.) was spotted around the courthouse with extra security—and we know exactly why. Picked to preside over the criminal case against Donald Trump related to the 2020 presidential election, Judge Chutkan is now

on the receiving end of attacks from the former president. As Trump wrote last Sunday on Truth Social (all-caps removed to spare your eyes), "There is no way I can get a fair trial with the judge 'assigned' to the ridiculous freedom of speech/fair elections case. Everybody knows this and so does she! We will be immediately asking for recusal of this judge on very powerful grounds." That said, we have not yet seen either a recusal motion or request to move the case to West Virginia, an idea floated by Trump and his lawyer **John Lauro** (which is unlikely to be granted if filed).

At the same time, Judge Chutkan—a graduate of Penn Law, where she served on the law review, and an alum of **Hogan Lovells**, **Boies Schiller**, and the storied D.C. Public Defender Service—is also on the receiving end of progressive hero worship. Trump opponents relish the fact that his fate is in the hands of an impeccably credentialed judge who happens to be a Black woman and an immigrant—and they have taken to making t-shirts that say "Judge Chutkan Fan Club" and "DONALD, YU TINK ME A EEDIOT?" (apparently a Jamaican patois slogan—but no, the Jamaican-born jurist did not say this to Trump, who actually did not attend the hearing).

It appears that Judge Chutkan is taking this all in stride. At a 90-minute hearing on Friday to discuss the prosecution's request for a protective order, she proceeded methodically through the parties' competing draft orders, paragraph by paragraph, declaring her intent to "to keep politics out of this." While acknowledging Trump's First Amendment rights, she made clear that he's subject to "restrictions like every other criminal defendant"—and he will not receive "any greater or lesser latitude than any defendant in a criminal case." Shortly after the hearing, Judge Chutkan issued a detailed and thorough protective order, striking a careful balance between the interests and positions of the parties. In the coming days, she will also set a trial date; the prosecution has proposed January 2, but Team Trump, which will share its views with the court in the next week or so, will surely push back.

Two other judges in the news:

- Judge **Brantley Starr** (N.D. Tex.)—who won Judge of the Week honors in June, thanks to his buzz-generating order on generative artificial intelligence—made headlines again for another unusual order. After holding Southwest Airlines in contempt for not complying with an earlier order of his in a religious-discrimination

- case, Judge Starr ordered three Southwest lawyers to attend religious-liberty training—sponsored by the controversial Alliance Defending Freedom. Before his 2019 appointment by President Trump, Judge Starr was part of a group of high-powered conservative lawyers who transformed the Texas Attorney General's Office into a litigation powerhouse (and in case you're wondering, yes, Judge Starr is related to the late Ken Starr, who was his uncle). [**UPDATE (8/20/2023, 7:44 a.m.)**: The ruling is on hold for now; Judge Starr has invited the parties to brief whether he should stay his decision pending appeal.]

- Orange County Superior Court Judge **Jeffrey Ferguson** was charged Friday with murdering his wife. According to law enforcement, Judge Ferguson texted his court clerk and bailiff, "I just lost it. I just shot my wife."

In memoriam: Judge **Rosemary Pooler**—the liberal lioness of the Second Circuit, whose battles with her archnemesis, Judge **José Cabranes**, made for juicy gossip (or what passes for gossip at that staid court)—passed away at 85. May she rest in peace,

**Rulings of the Week: a series of significant Second Amendment decisions.**

In a June episode of Advisory Opinions, I identified the Second Amendment as a future hotbed of litigation, after the Supreme Court's paradigm-shifting decision in *New York State Rifle & Pistol Association v. Bruen*. And this week we saw a slew of Second Amendment and weapons-related rulings, from all three levels of the federal judiciary.

Let's start with SCOTUS, which temporarily reinstated the Biden Administration's order regulating so-called "ghost guns," firearms without serial numbers that can be produced by buying a kit online and assembling the parts at home into a gun. The legal issue is interesting, as explored by Adam Liptak of the New York Times. Judge **Reed O'Connor** (N.D. Tex.), the ultra-conservative jurist who struck down the regulation last month, reasoned that "a weapon-parts kit is not a firearm" and "that which may become or may be converted to a functional receiver is not itself a receiver." But in the federal government's application for emergency relief, Solicitor General **Elizabeth Prelogar** wrote, "Every speaker of English would recognize that a tax on sales of 'bookshelves' applies to Ikea when it sells boxes of parts and the tools and instructions for assembling them into bookshelves." It appears that five justices found this persuasive, but four—Justices Thomas, Alito, Gorsuch, and Kavanaugh—noted their

dissents (without opinion). The most intriguing thing here is Justice Barrett's vote, which will be critical if the Court eventually grants cert; over at Slate, Mark Joseph Stern offers some thoughts.

The circuit courts also produced two opinions about the Second Amendment. In *Teter v. Lopez*, the Ninth Circuit, in an opinion by Judge **Carlos Bea**, considered Hawaii's ban on butterfly knives. Based on a long and learned analysis applying *Bruen* to the ban, including an extensive history of knife regulation, Judge Bea concluded that "[b]ecause the possession of butterfly knives is conduct protected by the plain text of the Second Amendment, and because Hawaii has not demonstrated that its ban on butterfly knives is consistent with this Nation's historical tradition of regulating arms, we conclude that section 134-53(a) violates Plaintiffs' Second Amendment rights." As I've explained before in these pages, I'm not a fan of guns; I have fewer problems with knives, which aren't nearly as lethal. (And as a Filipino-American, I might be more sympathetic to the plaintiffs here because, as noted by Judge Bea, the butterfly knife aka "balisong" might have originated in the Philippines.)

In *United States v. Daniels*, the Fifth Circuit, in an opinion by Judge **Jerry Smith**, held that preventing an individual from possessing a firearm if he is an "unlawful user" of a controlled substance violated the Second Amendment rights of a gun owner where the government "presented no evidence that he was intoxicated at the time of arrest, nor did it identify when he last had used marihuana." The defendant's "confession to regular usage" was insufficient to sustain his conviction (Hunter, did you catch all that?). Judge **Stephen Higginson** wrote a thoughtful concurrence describing the difficulties that lower courts are encountering in applying *Bruen*—and expressed concern that future decisions in this area of law "will constrain the ability of our state and federal political branches to address gun violence across the country, which every day cuts short the lives of our citizens."

Judge Higginson's prediction could already be coming to pass. In the District of Hawaii, Judge **Leslie Kobayashi** issued a temporary restraining order that blocks, for now, certain portions of that state's new gun law—perhaps most notably, a provision banning guns on Hawaii's famed beaches. In her 91-page opinion, Judge Kobayashi acknowledged "[a]n alarming increase in violent crimes involving firearms in Hawaii," but concluded that "the state does not provide any evidence that this nation has a

historical tradition of regulating or prohibiting the carrying of firearms on beaches." Interestingly enough, Judges Higginson and Kobayashi are both Obama appointees, suggesting to me that good-faith application of *Bruen* will lead to many decisions against firearms regulation, from both Republican and Democratic appointees.

Other rulings worth noting (with thanks to Short Circuit and How Appealing):

- *In re: Sealed Case*. The D.C. Circuit rejected the challenges of X, the social-media company formerly known as Twitter, to rulings from then-Chief Judge **Beryl Howell** (D.D.C.) related to a search warrant from special counsel **Jack Smith**. The warrant required the company to produce data and records related to Donald Trump's Twitter account, and it also prohibited Twitter from notifying anyone about the existence or contents of the warrant.

- *President and Fellows of Harvard College v. Zurich American Insurance Company*. The First Circuit shot down Harvard's effort to get its insurer to cover legal costs related to its unsuccessful defense of its racial preferences in admissions. And thanks to Judge **Bruce Selya**, a lover of language who's fond of using obscure words in his opinions, I now know the meaning of "sockdolager."

- *Appalachian Voices v. U.S. Department of the Interior*. The Fourth Circuit dismissed challenges to construction of the Mountain Valley Pipeline—but the judges didn't have to be happy about it, and they weren't.

- *Brackett v. Mayorkas*. Chief Judge **James "Jeb" Boasberg** (D.D.C.) adopted the "Fitzpatrick Matrix," developed by Professor **Brian Fitzpatrick** of Vanderbilt Law, as the proper method for determining attorneys' fees. This comes on the heels of adoption of Fitzpatrick's methodology by Vice Chancellor **J. Travis Laster** of Delaware Chancery Court.

**Litigation of the Week:** *Harrington v. Purdue Pharma, L.P.*

Certain observers of the Supreme Court don't have a problem with SCOTUS tackling some of the biggest societal issues our nation faces. Others wish the Court would step back from the headline fodder and focus more on technical legal issues that have given rise to circuit splits. The latest Litigation of the Week might make both camps happy.

On Thursday, the justices temporarily blocked the multibillion-dollar Purdue Pharma bankruptcy plan, which the Second Circuit would have allowed to proceed. At the center of the litigation is the opioid epidemic and the central role played in it by Purdue, manufacturer of the prescription painkiller OxyContin, which many view as having started or fueled the crisis. The bankruptcy plan would direct billions of dollars in the direction of plaintiffs who have suffered greatly from the epidemic and have sued Purdue and members of the billionaire Sackler family, who once controlled the company—and who have agreed to contribute $6 billion to the plan.

But the plan is also extremely controversial because it would extend massive liability protection to the Sacklers, protecting them from further lawsuits even though (1) they themselves have not filed for personal bankruptcy and (2) some unknown number of claimants against the Sacklers have not consented to have their claims released in bankruptcy. Indeed, the legality of these "nonconsensual third-party releases" is, in the words of Solicitor General Elizabeth Prelogar, a question that lower courts "are sharply and intractably divided on." So it should come as no surprise that the Court stayed the Second Circuit decision and granted certiorari, directing the parties to brief and argue "[w]hether the Bankruptcy Code authorizes a court to approve, as part of a plan of reorganization under Chapter 11 of the Bankruptcy Code, a release that extinguishes claims held by nondebtors against nondebtor third parties, without the claimants' consent." (My prediction: the Court says no, and the due-process-obsessed Justice Gorsuch writes the opinion.)

Runner-up for Litigation of the Week: *Rapaport v. Doe*, a defamation lawsuit brought by **Gideon Rapoport**, an NYU Law graduate and former **Kirkland & Ellis** summer associate, against anonymous posters on Reddit and Top Law Schools. Rapoport's complaint alleges that the defendants falsely accused him of being a sexual harasser, which my former colleague Joe Patrice described at Above the Law as "a perfectly colorable defamation claim." But then the complaint goes *way* off the rails, and by the end, it descends into a bizarre story of Rapoport's unrequited (intellectual) love for… libertarian law professor Richard Epstein? Click over to Above the Law and read the full thing—because seriously, I can't do this thing justice.

**Deal of the Week: Tapestry (owner of Coach) acquiring Capri Holdings (owner of Versace and Jimmy Choo) for $8.5 billion.**

Who doesn't love a mega-merger involving two public companies that own famous fashion brands? Tapestry Inc., owner of Coach and Kate Spade, announced its $8.5 billion acquisition of Capri Holdings Ltd., owner of Versace, Jimmy Choo, and Michael Kors. The law firms on the deal are **Latham & Watkins** for Tapestry, **Wachtell Lipton** for Capri, and **Sidley Austin** for Morgan Stanley, financial adviser to Tapestry. It might seem like a motley crew of brands—would *you* carry a Coach handbag while sporting a Versace outfit?—but from a business perspective, it makes sense for fashion empires to be diversified. As the super-quotable Michael Kors once quipped (Project Runway was never the same after he left), "Fashion is like food—some people like sushi, others think hamburgers are divine. People like different things!"

Publishing is a glamorous industry in its own way, and we saw a notable transaction there too. Paramount Global announced the sale of Simon & Schuster, the venerable publishing house, to Kohlberg Kravis Roberts & Co., the private-equity giant, for $1.62 billion. Because KKR is an investment firm rather than a strategic buyer, this deal doesn't raise the antitrust concerns that killed Paramount's earlier attempt to sell Simon & Schuster to Penguin Random House. In terms of legal counsel, Paramount is represented by **Shearman & Sterling**, soon to be A&O Shearman, while KKR is represented by **Simpson Thacher & Bartlett**, one of its go-to firms for decades.

**Law Firm of the Week: Dentons.**

**Dentons**—what's a Dentons? A rival to Applebee's and Chili's? A British pharmacy chain?

After its 2015 merger with China's giant **Dacheng Law**, Dentons became the world's largest law firm by headcount, adopting the moniker of **Dacheng Dentons** (with Chinese characters in its name). At the same time, the Dentons brand fell off the U.S. Biglaw map. With the majority of its 12,000 lawyers based in China, Dacheng Dentons didn't qualify for influential industry rankings like the revenue-based Am Law 100 and the headcount-based NLJ 500 , since these rankings require a certain percentage of a firm's lawyers to be located in the United States. And given how rankings-focused lawyers are, not being in the rankings made Dentons something of a non-entity. In addition, lawyers are obsessed with Biglaw's profits-per-equity-partner figures—and after its merger with a mammoth law firm out of China, where law is far less lucrative,

the profits-per-partner figures of Denton plummeted to laughably low levels by Biglaw standards (around $379,000, per Law.com).

Might Dentons return to relevance? That could be a benefit of its just-announced breakup with Dacheng, which Dentons attributed to "new mandates and requirements [from the Chinese government] relating to data privacy, cybersecurity, capital control, and governance." For example, a provision in China's new counterespionage law requires Chinese firms to keep the names of clients secret from foreign entities, but this would create big problems for purposes of conflict checks. Situating this in terms of the bigger picture of U.S.-China relations, as explained by the Times, "Dentons's decision to quit the country and new investment limits by the Biden administration underscore the growing challenges facing Western companies" in China.

From the perspective of Dentons, its divorce from Dacheng is probably just as well, since the Chinese legal market was never that lucrative. As law-firm consultant Bruce MacEwen told Reuters, the business justification for being in China is "getting slimmer and slimmer," and for many, "the reputational risk already far outweighs any conceivable economic benefit." So the legal and regulatory changes imposed upon Dacheng Dentons by China were perhaps the kick in the pants to unwind a deal that should have been undone years ago. (Dentons will maintain a Hong Kong office, as many other global law firms do, and Dacheng will be its "preferred law firm" for clients with legal needs in China.)

The week brought good news and bad news for the embattled **Stroock** law firm. To get the bad news out of the way, the firm suffered more partner departures, with five restructuring and finance partners leaving for **Morgan Lewis & Bockius**. But on the bright side, and following up on a possibility I reported on last week, Stroock will be able to buy out its expensive pension plan, after retired Stroock partners assented to the proposal. This significantly improves the firm's chances of finding a merger partner —but whether it can do so in time remains to be seen.

**Move of the Week: Viet Dinh leaving Fox Corporation.**

After Fox Corporation paid out a massive $787.5 million to settle the defamation lawsuit of Dominion Voting Systems, widely viewed as a disastrous outcome for Fox, many

observers wondered whether the company might dismiss its top lawyer, chief legal and policy officer **Viet Dinh**. But months passed since the April settlement, so I figured that Dinh—who enjoys a close relationship with the Murdoch family, which controls the Fox media empire—was safe. Then, fairly late on Friday, we learned that Dinh will be stepping down as CLO at the end of the year, transitioning into the role of "Special Advisor." As set forth in Fox's Form 8-K announcing the news, Dinh is walking away with a $23 million cash payment, and he'll earn an additional $2.5 million a year in his two years as Special Advisor.

It's not clear what Dinh will do next. As I discussed with him in a March 2021 interview, he's had an impressively wide-ranging career, featuring stints in academia, government, Biglaw, and the boutique world. His separation agreement with Fox doesn't close many doors (aside from working for seven media companies identified by name). In a statement, Dinh said he looks forward "to returning to my roots of working on multiple ventures and with many clients across a variety of disciplines." (I reached out to Dinh but didn't hear back—so the discussion that follows is simply my speculation, not based on inside info.)

What might have gone down here? If the Murdochs had truly wanted Dinh's head to roll, they could have axed him back in April—when they fired another star in the Fox firmament, Tucker Carlson, in a Dominion-driven dismissal. Instead, they left him untouched until August. And even now, he's being allowed to stay in his current role until the end of the year, then walking away with almost $30 million. This isn't your classic "here's a box with your stuff, don't let the door hit you on the way out" kind of canning; we should all be so lucky to get "fired" like this.

And even after the Dominion debacle, Dinh remained close to the Murdochs—or at least wanted folks to be under that impression. At a fundraiser for Senator Joe Manchin (D-W. Va.) that Dinh hosted in the spring at his $20 million Brentwood mansion, he took a brief call from Rupert Murdoch, right in the middle of his welcoming remarks—a nice little flex for his guests. The attendees couldn't hear Murdoch's end of the conversation, but afterward Dinh said something like, "Senator, pardon the interruption, but that was my boss. Rupert sends his regards—and knows you love a good sauvignon blanc, so please allow me to share you with a bottle of my best." A server then poured a

glass and handed it to Dinh, who in turn presented to Senator Manchin. (Yes, I love *Succession*, but this scene actually happened.)

Given all this, my guess is that the Murdochs—or at least Lachlan, a close friend of Dinh's who picked him as the godfather to one of his children—would have been happy to keep him in place. But if you take a close look at the New York Times's [deep dive into Dominion](#) in late May, which painted Dinh in a less-than-flattering light, it's clear that some board members spoke to the Times and threw Dinh under the proverbial bus. My speculation is that some board members have been pushing for Dinh's ouster for months. This resolution—dismiss Dinh as CLO, but don't let it take effect until year's end, plus give him a ton of money and a face-saving role as "Special Advisor"—was thus a compromise between Dinh's defenders, including but not limited to Lachlan Murdoch, and Dinh's detractors on the board.

(At the end of my 2021 interview of Dinh, I asked him whether he watched *Succession*. "I have not watched *Succession*," he said with a chuckle, "but I hear it's a pretty good piece of fiction." My suggestion to Dinh for how to use his two-year stint as "Special Advisor": binge-watch *Succession*, then connect with J. Smith Cameron, who brilliantly portrayed Waystar Royco general counsel Gerri Kellman, and write a pilot together for a *Succession* spinoff starring her.)

Runners-up for Move of the Week: a pair of high-profile hires in the antitrust space. **Paul, Weiss** [hired](#) **Scott Sher** away from **Wilson Sonsini**, and **King & Spalding** [hired](#) **Sean Royall** away from **Sidley Austin**. Both Sher and Royall led the antitrust practices at their former firms, and their moves reflect the continuing high demand for antitrust and competition experts.

**Job of the Week: A Practice Group Manager at an Elite, Am Law 50 Firm.**

**Lateral Link** is excited to partner with a distinguished, Am Law 50 firm in their search for dedicated securities and corporate associates. Embark on a transformative career path as the Practice Group Manager for their esteemed corporate and securities division, available in either New York or Philadelphia. Play a pivotal role in mentoring, strategic planning, and workload oversight. This firm is celebrated by Vault for its commitment to diversity and excellence. Reach out to Lateral Link recruiters **J'lene**

**Mortimer** (jmortimer@laterallink.com) or **Jennifer Anderson** (janderson@laterallink.com) to explore this opportunity.

Now Zach and I are off to Jacob's Pillow for a performance of the Complexions Contemporary Ballet. We aren't really "dance people," but a friend insists that this is a must-see. I hope you have interesting plans for the rest of the weekend as well.

 20 Likes

## Discussion about this post

**Comments**  Restacks

 Write a comment...

 **Mitchell Epner**  Mitchell Epner on Law  Aug 15, 2023  ♥ Liked by David Lat

In 1994-95, I clerked for a First Circuit judge and got to know Judge Selya quite well - especially during the annual March sitting in Puerto Rico (a welcome break from the Maine winter). Judge Selya is beyond brilliant. He is, as you noted, fond of using words that send people scurrying to the dictionary.

My favorite example involved a case that was to be heard by Judge Selya, my judge and a third judge. I wrote the bench memo to prepare my judge for oral argument. Part of my job was to assess the relative merits of each side's position. I wrote that I thought that the appellant had raised a novel and potentially winning argument, if it had been adequately preserved for appeal.

My judge returned from oral argument and told me that (1) the tentative vote was in favor of the appellee and (2) Judge Selya would be writing. I was interested to see how Judge Selya would handle the "difficult" issue under the Sentencing Guidelines that I had flagged for my judge. When the draft opinion came out of the fax machine (it was a long time ago), I read the text looking for a discussion of my pet issue. There was none. Rather, there was a footnote that termed the argument "jejune" with no further elaboration.

https://scholar.google.com/scholar_case?case=4088617627054708989&q=jejune&hl=en&as_sdt=4,105,119&as_ylo=1994&as_yhi=1995

That was the day I learned (a) that "jejune" was a word and (b) it meant "insipid".

LIKE (1)    REPLY    SHARE



**Matt Stillerman**  Aug 13, 2023  ♥ Liked by David Lat

David, my speculation about the Hunter Biden case has taken a different turn than yours. My understanding is that with plea deals prosecutors may avoid risk, or avoid a problematic situation, where for instance, none of the available choices accords with justice or the public good.

My guess is that this is the sort of situation, not publicly revealed, that David Weiss faced. Additionally, the very high public profile of the defendant would serve to magnify any imperfections in the prosecution's actions. This unknown situation gave Hunter Biden an unusual degree of leverage, resulting in the plea deal. With the deal squashed, Weiss is back to his choice among bad options. With the special prosecutor appointment, he has a bit more freedom to act, with his judgement less vulnerable to second-guessing.

LIKE (1)    REPLY    SHARE

1 reply by David Lat

7 more comments...

© 2024 David Lat · Privacy · Terms · Collection notice
Substack is the home for great culture