EXHIBIT 6

FILED: NEW YORK COUNTY CLERK 02/15/2022 12:59 PM

Case 1:24-cv-05942-JGLC    Document 81-6    Filed 10/03/25    Page 2 of 29

## SUPREME COURT OF THE STATE OF NEW YORK
## NEW YORK COUNTY

| PRESENT: | **HON. BARBARA JAFFE** | PART | 12 |
|---|---|---|---|
| | *Justice* | | |

-----------------------------------------------------------------------------X

MORGAN CAREY,

Plaintiff,

- v -

MARIAH CAREY, MACMILLAN PUBLISHING
GROUP, LLC D/B/A HENRY HOLT AND
COMPANY, MICHAELA DAVIS, ANDY COHEN
D/B/A ANDY COHEN BOOKS,

Defendants.

-----------------------------------------------------------------------------X

| | |
|---|---|
| INDEX NO. | 152192/2021 |
| MOTION DATE | |
| MOTION SEQ. NO. | 003 004 005 |

**DECISION + ORDER ON MOTION**

The following e-filed documents, listed by NYSCEF document number (Motion 003) 30-33, 53, 64, 65, 67

were read on this motion for _____ discovery _____ .

The following e-filed documents, listed by NYSCEF document number (Motion 004) 54-59, 68-71, 77

were read on this motion to _____ dismiss _____ .

The following e-filed documents, listed by NYSCEF document number (Motion 005) 60-63, 72-76

were read on this motion to _____ dismiss _____ .

Plaintiff brings this action against defendant Mariah Carey and defendants Macmillan

Publishing Group, LLC d/b/a Henry Holt and Company, Michaela Angela Davis, and Andy

Cohen d/b/a Andy Cohen Books (Andy Cohen Books) (collectively, publisher defendants)

(together with defendant Carey, defendants) alleging that nine passages in Carey's memoir

defamed him.

In motion sequence 003, plaintiff moves pursuant to CPLR 3211 (g) (3) for an order

granting him leave to serve written discovery demands and to take up to three depositions of

defendants. In motion sequence 004, publisher defendants move pursuant to CPLR 3211 (a) (7),

CPLR 3211 (g), and Civil Rights Law §§ 70-a (1) (a) and 76-a, for an order dismissing the first

Case 1:24-cv-05942-JGLC   Document 81-6   Filed 10/03/25   Page 3 of 29

amended complaint against them and an award of their costs and attorney fees. In motion

sequence 005, Carey moves pursuant to CPLR 3211 (a) (7) and (g) for an order dismissing the

first amended complaint as against her. The motions are consolidated for disposition.

## I. PERTINENT BACKGROUND

The following facts are mostly drawn from the corrected first amended complaint dated

July 6, 2021 (FAC) unless otherwise indicated.

Plaintiff, Carey's older brother by 10 years (NYSCEF 45, FAC ¶ 7**), was born with

"cerebral palsy, grand mal and petit mal epilepsy, and a left leg which was several inches shorter

than the right . . . [H]e later overcame his disabilities" (*id.*, ¶ 9) and during his childhood, he

briefly stayed at the Sagamore Children's Psychiatric Center (*id.*, ¶ 42). Since then, plaintiff has

worked at "iconic nightclubs such as Studio 54," as a personal trainer for celebrity clients, and

has written for Men's Fitness Magazine. (*id.*, ¶¶ 9-10). He also developed Korean musical acts

(*id*., ¶ 13) and with his wife, has written two screenplays, one of which has been optioned for a

film (*id.*, ¶ 14).

Carey is a "world-renowned musician, singer and songwriter" (*id.*, ¶ 8); Macmillan is a

book publisher (*id.*, ¶¶ 26-27); Andy Cohen Books is a Macmillan imprint (*id.*, ¶ 3); Davis is a

professional writer (*id.*, ¶ 2).

On or about September 2020 or October 29, 2020, Macmillan published Carey's memoir,

written by Carey and Davis and entitled "The Meaning of Mariah Carey" under the Andy Cohen

Books imprint (*id.*, ¶¶ 1, 3 and 26). There are nine allegedly defamatory passages about plaintiff:

1. "It took twelve cops to pull my brother and father apart. The big
   bodies of men, all entangled like a swirling hurricane, crashed loudly
   into the living room. I was a little girl with very few memories of a big
   brother who protected me. More often, I felt I had to protect myself
   from him, and sometimes I would find myself protecting my mother
   from him too.

Case 1:24-cv-05942-JGLC   Document 81-6   Filed 10/03/25   Page 4 of 29

This, of course, was not the first vicious fight between my father and brother – for as long as I could remember, their relationship had been a war zone. But it was the first time the troops had been called in. It was also the first time I witnessed the possibility that a member of my family could brutally die in front of my eyes. Or that I could die too. I wasn't yet four years old" (*id.*, ¶ 29).

2. "Suddenly there was a loud, sharp noise, like an actual gunshot. My brother had pushed my mother with such force that her body slammed into the wall, making a loud cracking sound. I saw her frame go rigid; for a moment she appeared frozen against the wall, pinned up like a painting, her feet lifted several inches off the ground. Next thing I knew she was totally limp, as if her bones had melted, folding onto the floor. It was a split second. It was an eternity. My eyes were still fixed in place, only now I was looking at my mother collapsed in a crumpled pile on the floor. My brother stomped out and slammed the door, shaking the house one last time, and sped off in her car" (*id.*, ¶ 38).

3. "The boy had been 'institutionalized,' placed in the precarious 'care' of the state, the first stop on a dangerous fast track to becoming a statistic. At one point Morgan had been taken to Sagamore Children's Psychiatric Center, a care facility for seriously emotionally troubled children and families in crisis. Morgan was a crisis. I also heard a psychiatrist had concluded that a significant contributing factor in Morgan's behavioral problems was Alison, who had a talent for instigating and manipulating Morgan to his breaking points" (*id.*, ¶ 41).

4. "If there were a fairy tale that could come close to describing my life, it would be 'The Three Little Pigs.' My childhood was a series of fragile, unstable houses, one after the other, where inevitably the Big Bad Wolf, my troubled brother, would huff and puff and blow it all down. I never felt safe. I never was safe. His rage was unpredictable; I never knew when it would come, or who or what it would devour" (*id.*, ¶ 44).

5. "At the beginning of my career, Morgan was on a mission to be known as the one who was responsible for 'discovering' me … Morgan had several sketchy contacts in the music industry but also introduced me to some important players in the fashion scene, like the late legendary hairstylist Oribe. In some circles, I was even known as 'Morgan's little sister,' though he hadn't seen me as his little sister in a very long time. I was his little ticket to wealth and fame.

I've often publicly recognized Morgan for being the one who loaned

Case 1:24-cv-05942-JGLC   Document 81-6   Filed 10/03/25   Page 5 of 29

me five thousand dollars to pay for my first professional demo, for which I remain grateful and which I paid back five thousand times over. And I would continue to pay and *pay*.

I never thought that modest initial loan made me beholden to him or should allow him to have any say in my career. I was very young, but I knew not to do business with any of the questionable music folks my brother tried to get me to work and sign with. I knew for certain, that for me, business with Morgan would come with *serious* strings. Like a noose" (*id.*, ¶ 46) (emphasis in original).

6. "He was in the downtown New York scene in the late eighties. He worked in some of the hippest bars and clubs. He was strikingly handsome and occasionally worked as a model. He was well known and well liked. He discreetly supplied the beautiful people with their powdered party favors. He was diabolically charismatic" (*id.*, ¶ 49).

7. "The vibe was getting increasingly creepy and claustrophobic. I remember Morgan saying in his quiet sinister way, 'I got this plan to shut him up. You don't need to know the details, but believe me I can make him shut the fuck up.' He went on to say that all he needed was five thousand dollars. There it was. I looked over at my mother, hoping to get some clarity. She just kept her eyes fixed on Morgan, who had obviously convinced her to let him run the show. He continued to remind me how mean and vindictive her husband was (and indeed he was—he'd been displaying opportunistic behavior since the moment he met me) and that the press would shame me and destroy my career. All I had ever lived for was to be an artist and I had *just signed a record deal*. Maybe it all could be taken away in an instant? And he said it again – for 'just five thousand dollars,' he could protect me and take care of the threat. 'It's just five thousand dollars. No one will ever know.' Five thousand dollars for what? To *do* what? A sickening panic began to bubble in my lower belly.

Morgan had a long history of violence, of being mixed up with shady characters and shady situations, and there was no telling what he might do for money. In 1980, he was involved in a scandalous Suffolk County murder case. John William Maddox was murdered by his wife, Virginia Carole Maddox. Their son was an acquaintance of Morgan's. Before the night she shot her husband in the neck with a rifle, she propositioned Morgan to kill him for her for thirty thousand dollars. He accepted a $1,200 advance but did not carry out the job. According to the court records, her solicitation of Morgan (he was compelled to testify before a grand jury) was key evidence in disproving her claim of self-defense and helped lead to her murder conviction" (*id.*, ¶ 55) (emphasis in original).

Case 1:24-cv-05942-JGLC   Document 81-6   Filed 10/03/25   Page 6 of 29

8. "At one point we were all hanging out together at the house, and Morgan proceeded to get spectacularly inebriated. When he disappeared for a bit, my mother turned directly to her usual dramatics. 'Where's Morgan?' she bellowed. 'I can't find Morgan!' Mind you, Morgan was a thirty-something grown man, but still my mother was in a self-induced panic. '*I can't find Morgan*!' She called his hotel room repeatedly, but there was no answer. So, what did she do? She called the cops. My mother called the cops in Aspen, Colorado, to find my nonwhite, sometimes drug dealing, been-in-the-system, drunk-ass brother. The cops came to the hotel, and it was a whole big drama. She asked them to break down his hotel door, behind which it turned out Morgan was lying naked, butt up, passed out on the bed. The news spread like wildfire throughout the town, and that, ladies and gentlemen, was the last time Morgan and Cop Caller Mom were invited to spend Christmas with me in Aspen. I really *don't* want a lot for Christmas. Particularly not the cops" (*id.*, ¶ 62) (emphasis in original).

9. "The only time things came close to tension was when my ex-brother Morgan came to the hospital. Our father refused to see him; the pain they triggered in and caused each other in this life was too dense to unpack, even at the end" (*id.*, ¶ 65).

Following the book's publication, a film producer ended negotiations for a film production of a screenplay written by plaintiff and his wife (*id.*, ¶¶ 15-17).

Plaintiff commenced this action on March 3, 2021, alleging that the above passages are false, defamatory or defamatory *per se*. In response to defendants' motions to dismiss the complaint, plaintiff filed the FAC, which sets forth eight causes of action for defamation and eight causes of action for injurious falsehood. He also seeks discovery. Defendants withdrew their original motions (NYSCEF 50-51).

## II. DISCUSSION

"In assessing the adequacy of a complaint under CPLR 3211 (a) (7), the court must give the pleading a liberal construction, accept the facts alleged in the complaint to be true and afford the plaintiff 'the benefit of every possible favorable inference'" (*J.P. Morgan Sec. Inc. v Vigilant*

Case 1:24-cv-05942-JGLC     Document 81-6     Filed 10/03/25     Page 7 of 29

*Ins. Co.*, 21 NY3d 324, 334 [2013] [citation omitted]). "'[I]f from its four corners factual allegations are discerned which taken together manifest any cause of action cognizable at law a motion for dismissal will fail.'" (*African Diaspora Mar. Corp. v Golden Gate Yacht Club*, 109 AD3d 204, 211 [1st Dept 2013] [citation omitted]).

CPLR 3211 (g) governs motions to dismiss strategic lawsuits against public participation, known by its acronym, SLAPP. If the defendant on a motion brought pursuant to CPLR 3211 (a) shows that the action involves public petition and participation, then the burden shifts to plaintiff to demonstrate that "the cause of action has a substantial basis in law" (CPLR 3211 [g] [1]). The court must consider the parties' pleadings and affidavits in determining whether the cause of action has a substantial basis in law (CPLR 3211 [g] [2]); a failure to sustain that burden will warrant not only a dismissal but also an award to the defendant of its costs and attorney fees (Civil Rights Law § 70-a [1] [a]). Pursuant to CPLR 3211 (g) (3), discovery is stayed upon the filing of a motion to dismiss, but the opposing party may seek discovery "on noticed motion and upon a showing … by affidavit or declaration under penalty of perjury that, for specified reasons, it cannot present facts essential to justify its opposition."

### A.  Civil Rights Law § 76-a (1) (a) (anti-SLAPP statute)

Publisher defendants allege that as Carey chronicles her experiences navigating a difficult childhood, domestic violence, race, class, and how she, an internationally famous singer, songwriter, and musician, rose above such adversity, she addresses matters of public concern and thus, plaintiff's action constitutes a SLAPP suit. Carey, likewise, alleges that the book concerns a communication made in a public forum in connection with an issue of public interest, and thus, the action meets the definition for a claim involving public petition and participation.

Plaintiff opposes and argues that Carey is not expressing an opinion on a matter of public

interest and that the comments were not published in a public forum.

The anti-SLAPP statute is "specifically aimed at broadening the protection of citizens facing litigation arising from their public petition and participation," particularly in defamation cases. (*600 W. 115th St. Corp v Von Gutfeld*, 80 NY2d 130, 137 n 1 [1992], *rearg denied* 81 NY2d 759 [1992], *cert denied* 508 US 910 [1993]).

An "action involving public petition and participation" is a claim based upon:

1.  any communication in a place open to the public or a public forum in connection with an issue of public interest; or
2.  any other lawful conduct in furtherance of the exercise of the constitutional right of free speech in connection with an issue of public interest, or in furtherance of the exercise of the constitutional right of petition.

(Civil Rights Law § 76-a [1] [a]). Damages are recoverable in a SLAPP suit only if:

in addition to all other necessary elements, [the plaintiff] shall have established by clear and convincing evidence that any communication which gives rise to the action was made with knowledge of its falsity or with reckless disregard of whether it was false, where the truth or falsity of such communication is material to the cause of action at issue.

(Civil Rights Law § 76-a [2]). The anti-SLAPP law is strictly construed. (*315 W. 103 Enters. LLC v Robbins*, 171 AD3d 466, 467 [1st Dept 2019], *lv dismissed* 34 NY3d 1151 [2020]).

It is not seriously disputed that a book chronicling Carey's life story qualifies as "other lawful conduct in furtherance of the exercise of free speech" (Civil Rights Law § 76-a [1] [a] [1]; *see Brown v Showtime Networks, Inc*., 394 F Supp 3d 418, 438 [SD NY 2019] [First Amendment safeguards rights of storytellers to transform stories of real people into books and movies]). The closer question is whether challenged speech is related to "an issue of public interest." In *Dun & Bradstreet v Greenmoss Builders*, the Court observed that "[i]t is speech on 'matters of public concern' that is 'at the heart of the First Amendment's protection'" (472 US 749, 758-759 [1985]) [internal quotation marks and citations omitted]), and a public concern is generally a

matter of political, social or other community concern (*Cioffi v Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F 3d 158, 164 [2d Cir 2006], *cert denied* 549 US 953 [2006]). The statute itself provides that the term "public interest" be construed broadly as "any subject other than a purely private matter." (Civil Rights Law § 76-a [1] [d]).

Whether a challenged statement relates to a matter of public concern is determined as of the time it was uttered (*see Coleman v Grand*, 523 F Supp 3d 244, 259 [ED NY 2021] [analyzing allegedly defamatory statements amid rising public concern over workplace sexual harassment]), and with respect to the "'content, form, and context . . . as revealed by the whole record'" (*Piercy v Federal Reserve Bank of NY*, 144 Fed Appx 897, 900 [2d Cir 2005] [citation omitted]).

Although it has been held that a matter is not of public interest when it constitutes "mere gossip and prurient interest" (*Huggins v Moore*, 94 NY2d 296, 302 [1999] [citation omitted]), it has also been held that "[the] scope of the subject matter which may be considered of 'public interest' … has been defined in most liberal and far-reaching terms … [and] include[s] all types of factual, educational and historical data, or even entertainment and amusement, concerning interesting phases of human activity in general" (*De Gregorio v CBS, Inc.*, 123 Misc 2d 491, 493 [Sup Ct, NY County 1984] [internal quotation marks and citation omitted]). A life story in the vein of Carey's was found to be a matter of public interest in *Brown*, 394 F Supp 3d at 438. There, the Court found that a film of a celebrity's life story was constitutionally protected as an expressive work under California law and as "a matter of public interest." (*Id.*).

In another case, a newspaper article reporting that a producer did not wish to pay a well-known actress for her work was deemed a "matter of genuine public interest, [and] reasonably related to matters warranting public exposition" (*Ortiz v Valdescastilla*, 102 AD2d 513, 518 [1st Dept 1984], *appeal withdrawn* 63 NY2d 773 [1984]), as was a magazine article depicting the

"difficulties in distributing a well-known designer's estate, complicated by a little known marriage, his numerous romantic relationships, and internal family conflict" (*Cassini v Advance Publs., Inc.*, 41 Misc 3d 1202[A], 2013 NY Slip Op 51553[U], *2 [Sup Ct, NY County 2013], *affd* 125 AD3d 467 [1st Dept 2015], *lv denied* 26 NY3d 902 [2015]). And in *Huggins*, *supra*, the Court held that "a 'human interest' portrayal of events in the lives of persons who are not themselves public figures [may be a matter of public interest], so long as some theme of legitimate public concern can reasonably be drawn from their experience." (94 NY2d at 303). Moreover, absent clear abuse, much discretion is afforded editors in determining whether content is of legitimate public interest. (*Huggins*, 94 NY2d at 304).

Not only individuals but topics such as domestic violence, "a persistent threat to individual safety, family wellbeing, and the public welfare" (*Cole v Cole*, 35 NY3d 1012, 1014 [2020] [Rivera, J., dissenting]), are a matter of legitimate public interest, as is child abuse (*Sarwer v Conde Nast Publs.*, 237 AD2d 191, 192 [1st Dept 1997], *lv dismissed in part, denied in part* 91 NY2d 865 [1997]), and race relations, deemed "inherently" a matter of public concern (*Pappas v Giuliani*, 290 F 3d 143, 154 [2d Cir 2002] [Sotomayor, J., dissenting] [citation omitted]). The statements in this action, insofar as they concern individuals and these topics, are of legitimate public concern and reasonably related to matters warranting public attention. (*See Huggins*, 94 NY2d at 304-305 [articles relaying personal story of popular actress's "tragic downfall from a position of stardom and wealth" related to "pervasive modern phenomenon of economic spousal abuse"]). They are not "mere gossip and prurient interest." Thus, based on the reasoning set forth in these cases, defendants demonstrate the applicability to this case of Civil Rights Law § 76-a (1) (a) (2).

While plaintiff concedes that "as a whole," the book "is obviously of public interest"

Case 1:24-cv-05942-JGLC    Document 81-6    Filed 10/03/25    Page 11 of 29

(NYSCEF 71, 75), and acknowledges that the book has reached number one on the New York

Times bestseller list, thereby signifying that it concerns "a topic of widespread interest" (*Wallace*

*v Henderson*, 2010 WL 1290911, *2, 2010 US Dist LEXIS 30519, *7 (SD Ca, Mar. 30, 2010,

No. 09cv1603-L(WMC)]), he maintains that the statements he identifies concern purely private

matters.

Plaintiff analogizes this action to *Cohen v Broad Green Pictures LLC*, where the Court

found that statements in a movie trailer depicting the plaintiff as an adulterer and philanderer did

not involve a subject "within the sphere of legitimate public concern." (160 AD3d 569, 571 [1st

Dept 2018]). Rather, the statements were made in the course of a scene where a woman is

"learning to drive in Manhattan, while discussing her personal relationships" (*id.* at 570). Here,

by contrast, the passages from the book reasonably relate to Carey's pathway to her public

career, even though details about her personal life are included (*see e.g. Stutzman v Armstrong*,

2013, WL 4853333, *7 2013 US Dist LEXIS 129204, *21-22 [ED Ca, Sept. 10, 2013, No. 2:13-

CV-00116-MCE-KJN] [finding that although two books contained details about Lance

Armstrong's personal life, as focus primarily on public cycling career and public activities, they

involved matters of public interest]).

Plaintiff's argument that the statements were not made in a public forum is unpersuasive,

as they were published in a publicly available book. (*See Harris v American Accounting Assn.*,

2021 WL 5505515, 2021 US Dist LEXIS 226517, *38 [ND NY, Nov. 24, 2021, No. 5:20-CV-

01057 (MAD/ATB)] [finding that conduct at issue, defendant's publication of scholarly writing

in publicly available academic journal, implicated Civil Rights Law § 76-a (1) (a) (2)]).

For these reasons, plaintiff fails to demonstrate that the book falls outside the scope of

New York's anti-SLAPP statute.

Case 1:24-cv-05942-JGLC    Document 81-6    Filed 10/03/25    Page 12 of 29

### B.  Substantial basis in law

Publisher defendants contend that plaintiff does not demonstrate that his action has a substantial basis in law as he does not plead actual malice or special damages, and as the statements are neither defamatory nor defamatory *per se*. Rather, the challenged statements, they assert, constitute opinion, are substantially true, or are protected under the fair reporting privilege set forth in Civil Rights Law § 74. Carey advances similar arguments.

According to plaintiff, the statements are false and reasonably susceptible of a defamatory connotation, and were published with actual malice, alleging that Carey "has built her public persona around a myth of having triumphed over her poverty and racism," whereas an examination of her past would have revealed her "lies" (NYSCEF 69). He strenuously denies having loaned Carey the money for her first demo, asserting that he paid for it directly (*id.*), and claims that Carey's "malicious global assault" on his character has affected him professionally as the film director is no longer interested in working with him (*id.*, ¶ 12).

In reply, publisher defendants observe that plaintiff fails to rebut their arguments that the statements are not actionable, absent a plea for special damages and actual malice, and that plaintiff's affidavit in which he describes incidents not contained in the pleadings, does not cure these deficiencies. According to Carey, plaintiff fails to demonstrate that the defamation claims have a substantial basis in law, and she observes that the complaint contains no specific plea for special damages and that he does not address her substantive arguments on whether the passages are actionable.

### 1.  Defamation

A defamatory statement is "a false statement which tends to expose the plaintiff to public contempt, ridicule, aversion or disgrace, or induce an evil opinion of him in the minds of right-

Case 1:24-cv-05942-JGLC    Document 81-6    Filed 10/03/25    Page 13 of 29

thinking persons, and to deprive him of their friendly intercourse in society" (*Foster v Churchill*,

87 NY2d 744, 751 [1996] [internal quotation marks and citation omitted]). The words

complained of must be reasonably susceptible to a defamatory connotation. (*Davis v Boeheim*,

24 NY3d 262, 268 [2014]). "Whether particular words are defamatory presents a legal question

to be resolved by the court in the first instance." (*Aronson v Wiersma*, 65 NY2d 592, 593

[1985]).

"[T]ruth or substantial truth is an absolute defense" to an action for defamation.

(*Stepanov v Dow Jones & Co., Inc*., 120 AD3d 28, 34 [1st Dept 2014]). As falsity must be

proven and only facts can be proven false, factual statements alone may properly be claimed as

defamatory for purposes of bringing an action for defamation. (*Davis*, 24 NY3d at 268).

Additionally, "[l]oose, figurative or hyperbolic statements … are not actionable" (*Dillon v City

of New York*, 261 AD2d 34, 38 [1st Dept 1999]), nor are statements of pure opinion because they

cannot be proven false (*Thomas H. v Paul B*., 18 NY3d 580, 584 [2012]).

Whether particular words constitute fact or opinion constitutes a question of law (*Davis*,

24 NY3d at 269), the resolution of which requires the consideration of:

> (1) whether the specific language in issue has a precise meaning
> which is readily understood; (2) whether the statements are capable
> of being proven true or false; and (3) whether either the full
> context of the communication in which the statement appears or
> the broader social context and surrounding circumstances are such
> as to signal … readers or listeners that what is being read or heard
> is likely to be opinion, not fact.

(*Id*. at 270 [internal quotation marks and citations omitted]). Context is key. (*Thomas H.*, 18

NY3d at 585). "Rather than sifting through a communication for the purpose of isolating and

identifying assertions of fact, the court should look to the over-all context in which the assertions

were made" to determine if the challenged statement conveys a fact. (*Davis*, 24 NY3d at 270

Case 1:24-cv-05942-JGLC   Document 81-6   Filed 10/03/25   Page 14 of 29

[internal quotation marks and citations omitted]; *Immuno AG. v Moor-Jankowski*, 77 NY2d 235, 243 [1991], *cert denied* 500 US 954 [1991] [key inquiry is whether challenged expression would reasonably appear to state or imply objective fact by considering impression created by words and general tenor of expression from point of view of reasonable person]).

While a statement of pure opinion is not actionable, a statement of mixed fact and opinion is. (*See Steinhilber v Alphonse*, 68 NY2d 283, 289 [1986] [describing mixed opinion as statement of opinion that implies that it is based on facts which justify opinion but are unknown to those reading or hearing it]). "The actionable element of a 'mixed opinion' is not the false opinion itself – it is the implication that the speaker knows certain facts, unknown to his audience, which support his opinion and are detrimental to the person about whom he is speaking." (*Id.* at 290).

A defamatory statement "must either cause special harm or constitute defamation per se." (*Dillon*, 261 AD2d at 38). Statements "(i) charging plaintiff with a serious crime; (ii) that tend to injure another in his or her trade, business or profession; (iii) that plaintiff has a loathsome disease; or (iv) imputing unchastity to a woman" are defamatory *per se*. (*Liberman v Gelstein*, 80 NY2d 429, 435 [1992]). Therefore, to state a cause of action for defamation, the plaintiff must plead "(1) a false statement that is (2) published to a third party (3) without privilege or authorization, and that (4) causes harm, unless the statement is one of the types of publications actionable regardless of harm." (*Stepanov*, 120 AD3d at 34).

"On a motion to dismiss a defamation claim, the court must decide whether the statements, considered in the context of the entire publication, are 'reasonably susceptible of a defamatory connotation,' such that the issue is worthy of submission to a jury" (*Stepanov*, 120 AD3d at 34 [citation omitted]).

Case 1:24-cv-05942-JGLC    Document 81-6    Filed 10/03/25    Page 15 of 29

Plaintiff claims that statements 1, 3, 4, 5, 7 and 9 are defamatory and statements 2, 6, and 8 are defamatory *per se*.

### 2.  Statements 1, 3, 4, 5, 7 and 9

### a.  Statement 1

Plaintiff alleges that statement 1 describes a physical altercation that never occurred and falsely depicts him as physically violent. (NYSCEF 45, ¶¶ 30-37).

While the statement focuses on how the relationship between plaintiff and their father impacted the young Carey (NYSCEF 45, ¶ 29), it also imparts facts capable of being proven true or false as each phrase has a precise meaning that may be easily understood to convey that plaintiff often engaged in violent, physical altercations during Carey's childhood. Moreover, given the tenor and context of the entire passage, the statement is also capable of inducing an evil opinion of plaintiff in the minds of right-thinking people. (*See Cuevas v Harvard Univ. Press*, 1999 WL 35133914 [Sup Ct, NY County 1999], *affd* 269 AD2d 328 [1st Dept 2000] [book falsely stating that plaintiff belonged to violent gang sufficient to expose him to disgrace and contempt]). Carey also described her feelings at the time as follows: "More often, I felt I had to protect myself from him, and sometimes I would find myself protecting my mother from him too." She also feared that she or a family member could "brutally die." (*Id.*, ¶ 29).

Carey relies, in part, on an allegedly vicious fight involving her brother, and suggests that there are other, undisclosed incidents where plaintiff may have acted aggressively toward her and their mother. The entire passage reasonably conveys a defamatory inference that plaintiff was abusive toward his family and is therefore, actionable as defamation. While Carey expresses opinions in these statements, they are nonetheless actionable as plaintiff alleges that the facts on which they are based are either falsely misrepresented or grossly distorted. *(See Parks v*

Case 1:24-cv-05942-JGLC    Document 81-6    Filed 10/03/25    Page 16 of 29

*Steinbrenner*, 131 AD2d 60, 63 [1st Dept 1987]).

### b.  Statement 3

Plaintiff alleges that statement 3 falsely portrays him "as the sole disruptive and abusive component in the father/son dynamic" (NYSCEF 45, ¶ 43) given his stay at a psychiatric center (*id.*, ¶ 41). As plaintiff admits that he had been institutionalized at the psychiatric center in his youth, the statement is a factual assertion that is substantially true (*see Birkenfeld v UBS AG*, 172 AD3d 566, 566 [1st Dept 2019] [dismissing complaint where quoted statements true]). The phrase "the first stop on a dangerous fast track to becoming a statistic," however, lacks a precise, readily-understood meaning. Although plaintiff argues that the disclosure of his stay at the psychiatric center violates his privacy, he concedes that New York does not recognize a common-law right of privacy (NYSCEF 71 at 8, 75 at 7).

### c.  Statement 4

Plaintiff alleges that statement 4 falsely depicts him as a physically violent person (NYSCEF 45, ¶ 45), likening him to the storybook character the "Big Bad Wolf." Such depictions, expressing Carey's feeling that she never felt safe and that plaintiff was unpredictable, are subjective and thus constitute opinions that are not verifiable. (*See Mann v Abel*, 10 NY3d 271, 277 [2008], *cert denied* 555 US 1170 [2009] [concluding that statements describing plaintiff as "political hatchet Mann" in article published under title "Borrelli on par with Marie Antoinette" expressions of opinion]).

### d.  Statement 5

According to plaintiff, statement 5 includes implications that he attempted to extort money from Carey and that he associated with "sketchy" or "questionable" people. (NYSCEF 45, ¶¶ 47-48). While a sentence prefaced by "I think" is not automatically deemed

non-actionable opinion (*Milkovich v Lorain Journal Co.*, 497 US 1, 19 [1990]), here, the sentence, "I never thought that modest initial loan made me beholden to him," when read in the context of the entire passage, signals to the average reader that the sentiments expressed therein constitute opinion (*see Stolatis v Hernandez*, 161 AD3d 1207, 1210 [2d Dept 2018] [dismissing complaint where, after viewing entire series of posts as a whole, posts protected opinion]). The excerpt also contains a great deal of nonactionable hyperbole: "little ticket to wealth and fame," "serious strings," "[l]ike a noose," "paid back five thousand times over" and "continue to pay and pay" (*see Dillon*, 261 AD2d at 40), or "rhetorical extravagance" (*Shulman v Hunderfund*, 12 NY3d 143, 150 [2009]). Thus, when read in context, the average reader would not reasonably conclude that plaintiff had engaged in a criminal act of extortion (*see Melius v Glacken*, 94 AD3d 959, 960 [2d Dept 2012] [calling plaintiff an "extortionist" who was seeking to "extort money" during heated exchange about lawsuit plaintiff had commenced not an accusation of criminal conduct]; *Trustco Bank of N.Y. v Capital Newspaper Div. of Hearst Corp.*, 213 AD2d 940, 942 [3d Dept 1995] [word "extortion" in newspaper article would not have led reasonable reader to conclude that plaintiff committed criminal act of extortion]).

Words like "sketchy" and "questionable" lack precise meanings (*see Rockwell Capital Partners, Inc v HempAmericana, Inc.*, 173 AD3d 639, 639 [1st Dept 2019]), and express Carey's opinion of plaintiff's acquaintances (*see e.g. Weisfeld v MacMillan Holdings, LLC*, 2009 NY Slip Op 33455[U], *7 [Sup Ct, NY County 2009] [statements describing plaintiff as "grinning, shady-looking white guy" represented author's opinion, not fact]).

Plaintiff also contends that statement 5 is defamatory due to its falsity, as he never loaned Carey money. Notwithstanding any issue as to whether the statement is false, a "hypertechnical parsing of a possible 'fact' from its plain context of 'opinion' loses sight of the objective of the

Case 1:24-cv-05942-JGLC   Document 81-6   Filed 10/03/25   Page 18 of 29

entire exercise, which is to assure that – with due regard for the protection of individual

reputation – the cherished constitutional guarantee of free speech is preserved." (*Immuno AG.*, 77

NY2d at 256). Consequently, whether the payment was or was not a loan is not dispositive of the

nature of the statement as defamatory. (*See Stolatis*, 161 AD3d at 1210 [series of posts as whole

constitute protected opinion]). In any event, the mere loaning of money is not reasonably

susceptible to a defamatory meaning.

### e. Statement 7

Plaintiff alleges that statement 7 falsely accuses him of accepting money to inflict

violence on their stepfather and to murder an acquaintance's father, and falsely claims that he

was compelled to testify before a grand jury in a criminal case (NYSCEF 45, ¶¶ 56-58).

The discussion of plaintiff's involvement in a murder case is protected under the fair reporting

privilege in Civil Rights Law § 74 ("[a] civil action cannot be maintained against any person,

firm or corporation, for the publication of a fair and true report of any judicial proceeding … or

for any heading of the report which is a fair and true headnote of the statement published."). If

the statement is "substantially accurate," in that it, despite minor inaccuracies, "does not produce

a different effect on a reader than would a report containing the precise truth,'" then it is

privileged under this statute and is deemed a fair and true report. (*Kinsey v New York Times Co*.,

991 F 3d 171, 178 [2d Cir 2021] [citation omitted]; *Aboutaam v Dow Jones & Co*., 180 AD3d

573, 574 [1st Dept 2020] [stating that substance of report must be "substantially accurate"]).

Here, statement 7 contains an accurate report that in the other action, plaintiff had been offered

$30,000 to murder the criminal defendant's husband and had been paid a $1,200 advance.

(*Maddox v Lord*, 818 F 2d 1058, 1060 [2d Cir 1987] ["Carey said that Mrs. Maddox paid him a

$1,200 advance"]).

Case 1:24-cv-05942-JGLC   Document 81-6   Filed 10/03/25   Page 19 of 29

Plaintiff also challenges whether he was compelled to testify, claiming that he had volunteered to do so. (NYSCEF 45, ¶ 59). Absent a dispute that he had testified, the alleged inaccuracy of Carey's statement is minor and, in any case, the word "compelled" is subject to several interpretations. Again, a hypertechnical parsing of words does not sufficiently demonstrate falsity. (*Immuno AG*, 77 NY2d at 256).

And yet, the statement as a whole expresses Carey's confusion at plaintiff's intent in telling her that he had a plan to silence her stepfather and that all he needed was five thousand dollars, which conversation panicked her. (NYSCEF 45, ¶ 55). In this statement, plaintiff's life is described as a "long history of violence, of being mixed up with shady characters and shady situations, and there was no telling what he might do for money." (*Id*.). To that extent, it conveys factual assertions of plaintiff's violent past and that he had agreed to perform potentially reprehensible acts for money in the past, as evidenced in his participation in the criminal case. When read in this context, the average reader could reasonably conclude that the statement implies that plaintiff would have agreed to inflict violence on their stepfather in exchange for money. Consequently, statement 7 is actionable for defamation.

### f. Statement 9

Plaintiff characterizes statement 9 as a "heinous and hurtful lie" because it falsely reports that he never visited their father in the hospital. (NYSCEF 45, ¶ 66). Even if false and hurtful, the statement conveys that plaintiff went to the hospital and that their father "refused to see him" (*id*., ¶ 65), and is thus not reasonably susceptible to a defamatory connotation. (*Sarwer*, 237 AD2d at 191).

### 3.  Statements 2, 6 and 8

#### a.  Statement 2

Plaintiff claims that statement 2 falsely conveys that he committed a violent felonious assault. (NYSCEF 45, ¶ 40). Absent a claim of an ensuing physical injury, that plaintiff pushed their mother is not felonious. (*Burdick v Verizon Communications, Inc.*, 305 AD2d 1030 [4th Dept 2003] [slander *per se* causes of action dismissed as complaint did not specify whether woman hit by defendant's employees suffered physical injury; libel *per se* causes of action also dismissed as "hit" and "took swing at" not reasonably susceptible to connotation of criminality]). Because statement 2 is not actionable as defamation *per se*, plaintiff must plead special damages, but fails to do so (*infra*, II.B.4.).

#### b.  Statement 6

Plaintiff alleges that in statement 6 he is accused of the serious crime of distributing cocaine (NYSCEF 45, ¶ 52-53 [plaintiff "discreetly supplied the beautiful people with their powdered party favors] [*id*., ¶ 49). The context reasonably permits an average reader to conclude that Carey refers in this statement to cocaine, which is a controlled substance (*see* Public Health Law § 3306), the possession and/or sale of which is proscribed by New York law (Penal Law § 220.00 *et seq*.; *Harris v Hirsh*, 228 AD2d 206, 209 [1st Dept 1996]). It thus implies that plaintiff committed a serious crime and is sufficient to support the fifth cause of action for defamation *per se*.

Although defendants frame this excerpt as a mere invocation of the 1980s Manhattan party scene (NYSCEF 61, Carey memo. at 16) and Studio 54, which was known for "its legendary drug-fueled, celebrity-filled parties" (NYSCEF 55 at 20), using a controlled substance is not a crime. Possessing and selling it is. (*See Harris*, 228 AD2d at 209). And although

Case 1:24-cv-05942-JGLC    Document 81-6    Filed 10/03/25    Page 21 of 29

statement 6 includes comments that are flattering to plaintiff, it nonetheless implies, if not

outright alleging, that he was supplying an illegal controlled substance to "the beautiful people"

who were part of the 1980s party scene, thereby alleging that plaintiff committed serious crimes.

### c.  Statement 8

In statement 8, plaintiff is depicted as a drunkard. (NYSCEF 45, ¶ 64). Public

intoxication is an offense, not a crime. (*People v Brown*, 2 AD2d 202, 204 [4th Dept 1956]), and

in any event, an "imputation of drunkenness is libelous only when accompanied by some

aggravating factor . . ." (*Alvarado v K-III Mag. Corp*., 203 AD2d 135, 137 [1st Dept 1994]). The

gathering at which plaintiff "proceeded to get spectacularly inebriated" was at a private home

(NYSCEF 45, ¶ 62), and when read in its entirety, is reasonably susceptible to the conclusion

that the description of plaintiff as "sometimes drug dealing, been-in-the-system" not only

implicates criminality (*see Yammine v DeVita*, 43 AD3d 520, 520 [3d Dept 2007] [labeling

plaintiffs "drug dealers" slanderous *per se*]), but as a factual statement that can be disproven and

thus, the statement pleads a cause of action for defamation *per se*.

Although Carey maintains that the phrase "sometimes drug dealing" is a "rhetorical

epithet," in light of the earlier statement that plaintiff had supplied clubgoers with "powdered

party favors," the average reader could understand this phrase to mean that plaintiff had

committed a serious crime. Although publisher defendants contend that "been-in-the-system"

refers to plaintiff's youthful stay at the psychiatric center, the average reader could reasonably

interpret it as meaning that he spent time in the prison system for a serious crime.

### 4.  Special damages

As set forth above, defamation, apart from defamation *per se*, is not actionable absent

special damages (*Liberman*, 80 NY2d at 434). The only statements that are actionable for

defamation are statements 1 and 7. Thus, plaintiff must plead special damages in relation thereto.

"'Special damages consist of the loss of something having economic or pecuniary value, which must flow directly from the injury to reputation caused by the defamation and not from the effects of the defamation.'" (*Franklin v Daily Holdings, Inc.*, 135 AD3d 87, 93 [2015] [internal citation omitted]). They "must be fully and accurately stated." (*Drug Research Corp. v Curtis Publ. Co.*, 7 NY2d 435, 440-441 [1960]). Round figures do not suffice. (*Franklin*, 135 AD3d at 93).

That the film producer ended the negotiations with plaintiff, even if due to Carey's influence in the entertainment industry and fear of angering her, does not constitute a special harm absent an allegation that it flowed directly from the alleged injury to plaintiff's reputation. Rather, it appears from the complaint that the souring of plaintiff's business relationship with the producer had nothing to do with plaintiff's reputation but everything to do with Carey's. Moreover, plaintiff does not specify in the FAC his alleged loss. (*See Vigoda v DCA Prods. Plus*, 293 AD2d 265, 266 [1st Dept 2002] [finding allegation of lost future income fatally conjectural in identity and speculative in amount]; *Matherson v Marchello*, 100 AD2d 233, 235 [2d Dept 1984] [claim for loss of business must be itemized]).

Plaintiff also fails to offer the express terms of his agreement with the film producer. (*See Erdman v Victor*, 2021 WL 2481254, *4, 2021 US Dist. LEXIS 113724, *9 [SD NY, June 17, 2021, No. 20 Civ. 4162 (LGS)] [lost chance of settlement pleaded in round figures too imprecise]). Thus, plaintiff fails to plead special damages.

<u>5. Actual malice</u>

To prevail in a SLAPP suit, the plaintiff must establish by clear and convincing evidence both that the challenged statement was made with knowledge of its falsity or with reckless

Case 1:24-cv-05942-JGLC     Document 81-6     Filed 10/03/25     Page 23 of 29

disregard of whether it was false and that the truth or falsity of such communication is material

to the cause of action at issue. (Civil Rights Law § 76-a [2]). Publisher defendants argue that

plaintiff fails to plead actual malice. Carey advances no argument on actual malice. (NYSCEF

76, Carey reply memo at 3 n 2).

Actual malice is demonstrated when material containing false information about plaintiff

is published with knowledge that it was false or with reckless disregard of whether it was false.

(*Sweeney v Prisoners' Legal Servs. of N.Y.*, 84 NY2d 786, 792-793 [1995], quoting *New York*

*Times Co. v Sullivan*, 376 US 254, 280 [1964]). It is not "spite or ill will." (*Kipper v NYP*

*Holdings Co*., 12 NY3d 348, 354 n 4 [2009]). Rather, the defendant must have "entertained

serious doubts as to the truth of his publication or acted with a high degree of awareness of …

probable falsity." (*Id.*, at 354 [internal quotation marks and citation omitted]). The focus is on the

publisher's state of mind when the statement was made. (*Id.* at 354-355). Conclusory allegations

of actual malice do not suffice. (*L.Y.E. Diamonds, Ltd. v Gemological Inst. of Am., Inc*., 169

AD3d 589, 591 [1st Dept 2019]).

In the FAC, the publisher defendants are alleged to have "acted in a grossly irresponsible

manner, without due consideration for the standards of information gathering and dissemination

ordinarily followed by responsible parties engaged in publishing" (NYSCEF 45, ¶ 72), and failed

to have investigated the truth or falsity of the statements "because of conscious indifference or

negligence, or because they deliberately chose to accept at face value everything [Carey] may

have told them" (*id.*, ¶¶ 76-77). These allegations are too conclusory to support an inference of

actual malice. (*See Rivera v Time Warner, Inc*., 56 AD3d 298, 298 [1st Dept 2008] [complaint

did not contain specific evidentiary facts from which to infer malice]; *Baker v City of New York*,

44 AD3d 977, 981 [2d Dept 2007] [complaint did not contain facts describing a deliberate act

Case 1:24-cv-05942-JGLC    Document 81-6    Filed 10/03/25    Page 24 of 29

punctuated with conscious falsity]).

Although plaintiff alleges that before the publication of the book, no one connected with writing, editing or publishing it approached him, asked him to verify anything in it or invited him to view a pre-publication copy (NYSCEF 69, ¶¶ 79-80), the failure to investigate the truth of a statement alone is insufficient proof of actual malice even if a prudent person would have investigated before publishing it (*Sweeney*, 84 NY2d at 793; *see Bement v N.Y.P. Holdings, Inc*., 307 AD2d 86, 91 [1st Dept 2003], *lv denied* 100 NY2d 510 [2003] [reporter's failure to read unpublished magazine article and minimal efforts to verify its accuracy with plaintiff or author a far cry from clear and convincing proof of reckless disregard for truth]). It has also been held that a book publisher has no independent duty to investigate an author's story absent actual, subjective doubts as to the story's accuracy. (*Stern v Cosby*, 645 F Supp 2d 258, 284 [SD NY 2009]).

According to plaintiff, a cursory examination of Carey's past would have revealed "her history of revisionism," which should have led publisher defendants to question Carey's veracity (*id.*, ¶ 4), noting that she disclosed her bipolar diagnosis to People Magazine whereas only two of her three publicly known hospitalizations are mentioned in the book (*id.*). He also maintains that Carey's alleged vindictiveness is reflected in her statement to Oprah Winfrey that, "[w]ell they drew first blood" and her feuds with other celebrities of which, he claims, publisher defendants were likely aware. (NYSCEF 69, ¶ 6).

The vague and conclusory allegations "rest only on surmise and conjecture, not evidentiary facts" (*see Hanlin v Sternlicht*, 6 AD3d 334, 334 [1st Dept 2004]), and in any event, it is not clearly alleged how Carey's alleged vindictiveness establishes that publisher defendants knew that her statements were false or that they entertained serious doubts about the truth of the

Case 1:24-cv-05942-JGLC    Document 81-6    Filed 10/03/25    Page 25 of 29

statements. Moreover, plaintiff's description of Carey's alleged vindictiveness more closely resembles spite or ill will. Evidence that Carey was a difficult person does not demonstrate that publisher defendants entertained or should have entertained doubts about the veracity of her statements at the time of publication.

Plaintiff also contends that publisher defendants had a financial interest in the book's publication (NYSCEF 69, ¶ 7), but offers no evidentiary facts or caselaw to support the proposition that such an interest renders the book defamatory. In any event, no actual malice may be inferred therefrom (*see Kipper*, 12 NY3d at 356; *Harte-Hankes Communications, Inc. v Connaughton*, 491 US 657, 667 [1987] ["If a profit motive could somehow strip communications of the otherwise available constitutional protection, our cases from *New York Times* to *Hustler Magazine* would be little more than empty vessels"]).

For all of these reasons, plaintiff fails to sustain his burden of demonstrating that the defamation claims against publisher defendants have a substantial basis in law.

### B.  Costs and fees

Pursuant to Civil Rights Law § 70-a (1) (a), the defendant in a SLAPP action:

> may maintain an action, claim, cross claim or counterclaim to recover damages, including costs and attorney's fees, from any person who commenced or continued such action; provided that … costs and attorney's fees shall be recovered upon a demonstration, including an adjudication pursuant to subdivision (g) of rule thirty-two hundred eleven ….

The statute does not address pre-answer motions for dismissal. (*See Center for Med. Progress v Planned Parenthood Fedn. of Am.*, 2021 WL 3173804, *10, 2021 US Dist LEXIS 140055, *27 [SD NY, July 27, 2021, No. 20 Civ. 7670 (CM)] [granting defendant's pre-answer motion to dismiss under anti-SLAPP statute and denying application for attorney fees and costs]). Absent a provision for such fees in this context and as the statute must be strictly construed, defendants

Case 1:24-cv-05942-JGLC   Document 81-6   Filed 10/03/25   Page 26 of 29

are not entitled to recover their costs and fees at this time. (*Id.*).

### C. Injurious falsehood (causes of action 9 through 16)

Defendants argue that plaintiff's causes of action for injurious falsehood are duplicative of his causes of action for defamation, that he fails to plead special damages, and that they do not concern plaintiff's business.

A defendant may be held liable for an injurious falsehood where he utters or furnishes false and misleading information maliciously or with the intention to harm another, or so recklessly and without regard to its consequences, that a reasonably prudent person should anticipate that damage to another will naturally follow. (*Penn-Ohio Steel Corp. v Allis-Chalmers Mfg. Co*., 7 AD2d 441, 444 [1st Dept 1959]). It "is essentially a form of interference with commercial or business relations" (*Tolisano v Texon*, 144 AD2d 267, 272 [1st Dept 1988] [Smith, J., dissenting], *rev on dissenting mem* 75 NY2d 732 [1989]), and the alleged falsehood must harm one's property or business reputation (*Pitcock v Kasowitz, Benson, Torres & Friedman LLP*, 74 AD3d 613, 615 [1st Dept 2010]). Thus, the elements to be proven are "falsity, malice or reckless disregard, and special damages" (*Tolisano*, 144 AD2d at 272), the latter of which must be pleaded with particularity (*BCRE 230 Riverside LLC v Fuchs*, 59 AD3d 282, 283 [1st Dept 2009]). Where a cause of action for an injurious falsehood relies on the same facts and seeks the same damages as one for defamation, the injurious falsehood claim is duplicative. (*Perez*, 116 AD3d at 602). Here, the facts underlying the causes of action for injurious falsehood are indistinguishable from those underlying the defamation causes of action.

Moreover, a cause of action for injurious falsehood generally targets statements that disparage the quality of plaintiff's goods and services whereas defamation focuses on statements that impugn a business's basic integrity or creditworthiness. (*Ruder & Finn v Seaboard Sur. Co*.,

52 NY2d 663, 670-671 [1981], *rearg denied* 54 NY2d 753 [1981]). Here, the FAC contains no comment on plaintiff's goods or services (*see Henneberry v Sumitomo Corp. of Am.*, 415 F Supp 2d 423, 472 [SD NY 2006] [dismissing injurious falsehood claim where statements questioned plaintiff's integrity and business methods, not its goods and services]) or a plea for special damages, which must be shown to be the direct and natural result of the alleged falsehood (*SRW Assoc. v Bellport Beach Prop. Owners*, 129 AD2d 328, 331 [2d Dept 1987]). Again, that the film director ended negotiations with plaintiff due to Carey's influence in the entertainment industry contradicts plaintiff's assertion that it was due to the harm to plaintiff's business reputation.

## V.  Discovery

Pursuant to CPLR 3211 (g) (3), "discovery, if granted, shall be limited to the issues raised in the motion to dismiss" a SLAPP suit. Plaintiff does not demonstrate that discovery will uncover information pertinent to publisher defendants' alleged actual malice (*Sackler v American Broadcasting Cos., Inc.*, 71 Misc 3d 693, 701 [Sup Ct, NY County 2020]). Nor does he articulate an inability to present facts essential to his opposition. (CPLR 3211 [g] [3] [opportunity to conduct discovery to be provided to party opposing motion to dismiss if party "cannot present facts essential to justify its opposition"]). The statute does not provide plaintiff here with an opportunity to rebut assertions made in affidavits offered in support of publisher defendants' withdrawn motion to dismiss the original complaint. As Carey raises no issue of actual malice, discovery on actual malice is not permitted.

## III. CONCLUSION

For all of the foregoing reasons, it is hereby

ORDERED, that the motion of plaintiff Morgan Carey for discovery (motion sequence no. 003) is denied; it is further

Case 1:24-cv-05942-JGLC    Document 81-6    Filed 10/03/25    Page 28 of 29

ORDERED, that the motion of defendant Macmillan Publishing Group, LLC d/b/a Henry Holt and Company, Michaela Angela Davis and Andy Cohen d/b/a Andy Cohen Books to dismiss the first amended complaint herein (motion sequence no. 004) is granted and the first amended complaint is dismissed in its entirety as against said defendants, with costs and disbursements to said defendants as taxed by the Clerk of the Court, and the Clerk is directed to enter judgment accordingly in favor of said defendants; it is further

ORDERED, that the action is severed and continued against the remaining defendant Mariah Carey; it is further

ORDERED, that counsel for publisher defendants serve a copy of this order with notice of entry upon the Clerk of the Court (60 Centre Street, Room 141B) and the Clerk of the General Clerk's Office (60 Centre Street, Room 119), who are directed to mark the court's records to reflect the change in the caption herein; it is further

ORDERED, that such service upon the Clerk of the Court and the Clerk of the General Clerk's Office be made in accordance with the procedures set forth in the *Protocol on Courthouse and County Clerk Procedures for Electronically Filed Cases (access*ible at the "E-Filing" page on the court's website at the address www.nycourts.gov/supctmanh); it is further

ORDERED, that the motion of defendant Mariah Carey to dismiss the first amended complaint herein (motion sequence 005) is granted to the extent of dismissing the first, second, third, fourth, sixth, eighth, ninth, tenth, eleventh, twelfth, thirteenth, fourteenth, fifteenth and sixteenth causes of action, and the balance of the motion is otherwise denied; and it is further

ORDERED, that defendant Mariah Carey serve an answer to the first amended complaint within 20 days after service of this order with written notice of entry.

20220215122555BJAFFEE34B28C9C0A74DBDB760E4A0C9217679

| | | |
|---|---|---|
| **2/15/2022** | | |
| **DATE** | | **BARBARA JAFFE, J.S.C.** |

| CHECK ONE: | ☐ CASE DISPOSED | ☒ NON-FINAL DISPOSITION | |
| | ☐ GRANTED ☐ DENIED | ☐ GRANTED IN PART | ☒ OTHER |
| APPLICATION: | ☐ SETTLE ORDER | ☐ SUBMIT ORDER | |
| CHECK IF APPROPRIATE: | ☐ INCLUDES TRANSFER/REASSIGN | ☐ FIDUCIARY APPOINTMENT | ☐ REFERENCE |